## AFFIDAVIT OF SPECIAL AGENT ROBERT FRASCA

1.      I, Special Agent Robert Frasca, being duly sworn, depose and state that:

INTRODUCTION

2.       I am a "federal law enforcement officer" within the meaning of Federal Rule of

Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal

laws and duly authorized by the Attorney General to request a search warrant.

3.      I have been employed as a Special Agent with the Drug Enforcement

Administration ("DEA") since 2010.  I currently am assigned to the New England Field

Division's Task Force 1 in Boston, Massachusetts.  Prior to my assignment in Boston, I was

assigned to the Lima, Peru Country Office in Lima, Peru for approximately two years.  Prior to

my assignment in Peru, I was assigned to the DEA Tucson District Office in Tucson, Arizona,

and the DEA Nogales Resident Office in Rio Rico, Arizona.  Prior to my employment with the

DEA, I was an Associate Court Officer with the State of Massachusetts Trial Court, from

January 2008 through July 2010.  In May 2008, I graduated from the University of

Massachusetts, Boston, with a Bachelor of Liberal Arts in Criminal Justice.

4.      As a DEA Special Agent, I am authorized to investigate violations of the laws of

the United States, including violations of federal narcotics laws in Title 21 of the United States

Code.  I have received significant training in the field of narcotic investigations and

enforcement.  Through my training and experience, I am familiar with the habits, methods,

routines, practices, and procedures commonly employed by people engaged in the trafficking of

illegal drugs.

1

5.      I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

6.      Based on my training and experience, I am also aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

PURPOSE OF AFFIDAVIT

7.     This affidavit is submitted in support of a criminal complaint against Cristopher Samuel MARTINEZ LARA ("MARTINEZ LARA") and Javier SANTIAGO-TORRES ("SANTIAGO TORRES") charging that, beginning at least in or about January 2021 and continuing until at least July 29, 2021, MARTINEZ LARA, SANTIAGO-TORRES, and others (the "defendants") did knowingly and intentionally conspire to possess with intent to distribute 400 or more grams of fentanyl, in violation of 21 U.S.C. § 846 (the "Target Offense").  This affidavit is also submitted in support of an application for a search warrant for the following location:

        a.   **181A Bow Street:** 181A Bow Street, Everett, Massachusetts is a single story, cement block building attached to a multi-story dwelling with white-colored siding.   ("Target Location 1").  A full description of Target Location 1 appears in Attachment A.   Target Location 1 is a suspected stash location and residence MARTINEZ LARA.

8.     I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other DEA agents, task force officers, and local police departments. This affidavit is intended to demonstrate that there is probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

PREVIOUS COURT ORDERS

9.     On March 19, 2021, the Honorable David H. Hennessy, United States Magistrate Judge, District of Massachusetts, issued (1) a Precise Location Warrant, and (2) a Direction Find Warrant for the cellular phone assigned phone number (978) 566-6467 ("Target Telephone

1"). (See 21-MJ-4081 and 21-MJ-4082 incorporated herein by reference).[1]  On April 27, 2021, the Honorable David H. Hennessy renewed the Precise Location Warrant for the Target Telephone.  (See 21-MJ-4197 incorporated herein by reference).  On March 19, 2021, the Honorable Katharine H. Parker, United States Magistrate Judge, Southern District of New York, issued a Direction Find Warrant for the Target Telephone.  (See 21 Mag. 4778).  On May 12, 2021 the Honorable David H. Hennessy issued a GPS Tracker Warrant for a 2015 Gray Jeep Cherokee known to be driven by CONCEPCION (See 21-MJ-4205).  On May 26, 2021 the Honorable Marianne B. Bowler renewed the Precise Location Warrant for Target Telephone 1. (See 21-MJ-2435).  On June 25, 2021, the Honorable M. Page Kelley, Chief United States Magistrate Judge, District of Massachusetts, renewed the Direction Find Warrant for Target Telephone 1 and the GPS Tracker Warrant for the 2015 Gray Jeep Cherokee.  (See 21 MJ. 6444 and 21-MJ-4205).  On July 22, 2021, the Honorable David H. Hennessy, United States Magistrate Judge, District of Massachusetts, renewed the Precise Location Warrant for Target Telephone 1.  (See 21 MJ-4223).

PROBABLE CAUSE

10.     Since January 2021, investigators with the Woburn Police Department and the DEA have made a series of controlled purchases of fentanyl and suspected fentanyl from a Drug Trafficking Organization ("DTO") operating in the Woburn and Lawrence areas.  Since

---

1 The Direction Find Warrant, 21-MJ-4082, was not executed because after the warrant was obtained Target Telephone 1 traveled to and stayed in New York.  On March 25, 2021 Target Telephone 1 returned to Massachusetts for approximately five hours before traveling to Maine overnight. Target Telephone 1 then passed through Massachusetts again on March 26, 2021 for approximately 3 hours before it exited Massachusetts again en route to New York. As such, agents were unable to successfully execute the Direction Find Warrant because of the limited time frame that Target Telephone 1 was in Massachusetts.

February 2021 agents have successfully made 11 undercover purchases of fentanyl and suspected fentanyl.  For each controlled purchase an undercover agent ("UC") contacted MARTINEZ LARA, or an associate, at Target Telephone 1 and placed an order for fentanyl. These contacts were made in a combination of voice calls, voicemail, and text messages.  After receiving the order, and negotiating the price to be paid, MARTINEZ LARA then dispatched a courier to supply the narcotics.  Further, as described herein, MARTINEZ LARA has traveled from New York to Massachusetts on several occasions, where he has met with co-conspirators at and near Target Location 1.

The Initial Controlled Buys

11.     **February 18, 2021**:  On the morning of February 18, 2021, the UC called Target Telephone 1 and spoke with a person later identified as MARTINEZ LARA.  During the call, the UC asked to purchase a "finger," or ten grams of fentanyl, from MARTINEZ LARA for $200.  MARTINEZ LARA agreed, then told the UC  someone would meet the UC in approximately forty-five minutes.

12.     Via text, the UC proposed meeting at a location in Woburn, Massachusetts.  At approximately 2:04 p.m., investigators observed a blue Kia Sedona minivan driven by a male later identified as Melvin PLAZA-RIVERA ("PLAZA-RIVERA") arrive at the prearranged meeting location.    At approximately the same time, the UC received a call from the Target Telephone during which MARTINEZ LARA stated that his associate was at the UC's location. The UC then walked to the blue Kia and entered the front passenger seat.  Once inside, the UC handed PLAZA RIVERA $200.  In exchange PLAZA RIVERA handed the UC a clear plastic bag containing a light brown powder substance. After a brief conversation with PLAZA

RIVERA, the UC exited the blue Kia.  The exchange between the UC and PLAZA RIVERA was video and audio recorded.

13.     The contents of the clear plastic bag obtained from PLAZA RIVERA contained approximately ten grams of a substance that field tested positive for the presence of fentanyl.

14.     **March 5, 2021 Controlled Buy**:  On the morning of March 5, 2021, the UC called Target Telephone 1 and spoke with MARTINEZ LARA. An unidentified Hispanic male (the "UM") translated between the UC and MARTINEZ LARA. During the call, the UC asked if he could purchase six "fingers," or sixty grams of fentanyl, for $1,000.  The UM spoke to MARTINEZ LARA and then confirmed that the UC could purchase six fingers for $1,000. Several minutes later, the UC received a call from Target Telephone 1. During the call, the UC and MARTINEZ LARA (with the UM translating) agreed to meet at 2:00 p.m. at the Tudor Glenn Apartments in Woburn, Massachusetts. Over the course of the afternoon, the UC spoke with MARTINEZ LARA multiple times regarding the meeting time.

15.     At approximately 3:14 p.m., agents observed a white Hyundai Santa Fe arrive at the prearranged location. The Hyundai Santa Fe was driven by an unidentified Hispanic male ("UM2"). At 3:23 p.m., the UC received a call from Target Telephone 1.  During the call UM2 told the UC that the driver was waiting at the agreed location in a Hyundai. The UC then walked toward and entered the front passenger seat of the Hyundai. UM2, the sole occupant of the Hyundai,  appeared not to speak any English. The UC showed UM2 the money.  UM2 then reached under the rear passenger seat, retrieved a plastic bag of light brown powder, and handed the bag to the UC. The UC handed  UM2 $1,000 and exited the Hyundai.  Thereafter, a field test conducted on the contents of the plastic bag was presumptive for the presence of fentanyl.

16.    **March 22, 2021 Controlled Buy**:  On March 21, 2021, the UC placed a recorded telephone call to the user of  Target Telephone 1 (MARTINEZ LARA) that went unanswered. A short time later the UC received an incoming call from Target Telephone 1 that was recorded. During this call the MARTINEZ LARA agreed to sell the UC 120 grams of fentanyl for $2,000. Arrangements were made for the UC to contact MARTINEZ LARA the following day when the UC was ready to purchase the fentanyl.

17.    **A**t approximately 1:00 p.m. on March 22, 2021, the UC began calling and texting Target Telephone 1 in order to conclude the agreed sale.  At approximately 1:03 p.m. the UC received a text from Target Telephone 1 with an address of 90 Bromfield Street, Lawrence, Massachusetts.  At approximately 1:16 p.m., the UC was dropped off near the intersection of Bromfield and Walnut Streets by an agent posing as a ride-share driver.  After exiting the undercover vehicle, the UC walked to the corner of Walnut and Bromfield Streets and placed a telephone call to Target Telephone 1 indicating he/she was at the pre-arranged spot.  The UC placed several unanswered calls to Target Telephone 1 while waiting on the street corner.

18.    At approximately 2:16 p.m. an agent conducting surveillance near Walnut Street observed  PLAZA RIVERA exit the front door of a nearby residence.  After closing the door behind him, PLAZA-RIVERA put up his hood and walked past the UC.  PLAZA-RIVERA then entered a blue Nissan Altima and signaled to the UC to get into the car.

19.    When the UC entered the vehicle, PLAZA-RIVERA stated that he was worried about "getting burned."  PLAZA-RIVERA then received an incoming call during which he spoke Spanish.  PLAZA-RIVERA then took a green plastic wrapped package out of his pocket and handed it to the UC.  The UC asked, "is there 12?" referring to 12 "fingers."  PLAZA-

RIVERA replied, "Yes."  The UC asked, "Good 12?" and PLAZA-RIVERA responded, "Yes," referring to the amount and quality of the fentanyl.  The UC provided PLAZA-RIVERA $2,000 and then exited PLAZA-RIVERA's vehicle.

20.    The green clear plastic bag that the UC obtained from PLAZA-RIVERA contained approximately 120 grams of a substance that field tested positive for the presence of fentanyl.

21.    **April 7, 2021 Controlled Buy**:  On April 6, 2021, the UC placed a recorded telephone call to Target Telephone 1 and spoke with MARTINEZ LARA.  During the call the UC told MARTINEZ LARA that he/she anticipated being in Lawrence the following day, between 1:00 p.m. and 2:00 p.m.  The UC further stated, "So $2,300, what can I get? Can you throw me 14?"  MARTINEZ LARA then stated, "Bring 2,400 and they give you." The UC replied, "2,300 is all I got."  MARTINEZ LARA responded, "Alright, let me call you right back."  MARTINEZ LARA, however, did not call the UC back.

22.    On April 7, 2021, the UC placed a recorded telephone call to Target Telephone 1. When MARTINEZ LARA answered, he stated to the UC that he (MARTINEZ LARA) was sorry for not calling him/her back.  The UC stated that he/she would be in the Lawrence area at approximately 2:00 p.m.  The UC stated that he/she still only had $2,300 and asked how much fentanyl he/she was able to buy for that amount.  MARTINEZ LARA responded, "I'll give you 13," meaning 13 fingers (130 grams of fentanyl).  Before the call ended, the UC stated that he/she would call when he/she was in the area, meaning the UC would call Target Telephone 1 when he/she was in the area.

23.    At approximately 2:02 p.m. the UC, who was the passenger in a vehicle driven by

an undercover agent, arrived in the vicinity of the agreed meeting location.  The UC then placed

four unanswered telephone calls to Target Telephone 1.  While the UC was waiting, an agent

conducting surveillance observed PLAZA-RIVERA, lean out of a window located on the

second floor of a nearby residence.  PLAZA-RIVERA was observed looking in both directions,

up and down Walnut Street.

24.     At approximately 2:14 p.m., the UC placed another call to Target Telephone 1.

After MARTINEZ LARA answered, the UC informed MARTINEZ LARA that he/she was at

the corner of Bromfield and Walnut Streets and that the UC did not like sitting there too long.

MARTINEZ LARA then confirmed the UC's location was Bromfield and Walnut.  During the

call, MARTINEZ LARA told the UC to go to 83 Walnut Street and meet the "guy in the car."

The UC then exited the UC vehicle and walked to the front of 83 Walnut Street.

25.     After arriving at the front of 83 Walnut Street, the UC did not observe anyone

waiting inside a vehicle.  Instead, PLAZA-RIVERA leaned out an open second story window

on the second floor of 83 Walnut Street and directed the UC to go to the front door.  PLAZA-

RIVERA then opened the front door of the building and told the UC to "come in."  The UC

stepped into the doorway and informed PLAZA-RIVERA that he (the UC) could not stay long,

as his friend did not want to wait.  PLAZA-RIVERA said, "Okay" and held his finger up to his

mouth to be quiet.  He took a plastic bag out of the front right pocket of his shorts and handed it

to the UC.  The UC then said, "Thirteen?" PLAZA-RIVERA said, "Yes."  The UC gave

PLAZA-RIVERA $2,300.  The UC told PLAZA-RIVERA, "I'm going bigger next time."

PLAZA-RIVERA said, "Yes."  The UC then returned to the UC vehicle.

26.     The two plastic bags that the UC obtained from PLAZA-RIVERA contained

9

approximately 136 grams of a substance that field tested positive for the presence of fentanyl.

SANTIAGO-TORRES Delivers Fentanyl for MARTINEZ LARA From Target Location

27.     **April 20, 2021 Controlled Buy**:  On April 15, 2021, the UC placed a recorded telephone call to Target Telephone 1 and spoke with MARTINEZ LARA in order to arrange the purchase of approximately 28 grams of fentanyl for $5,000.  Thereafter, over the course of several days, the UC and MARTINEZ LARA attempted, but failed, to complete the sale.  On April 20, 2021, at approximately 9:21 a.m., the UC placed a recorded call to Target Telephone 1 to confirm that the deal would be completed later in the day.  At approximately 10:02 a.m., the UC received an incoming text message from Target Telephone 1, which  stated, "1 orient ave Everett ma 02149 …"

28.     In a previous surveillance operation on February 18, 2021, agents followed PLAZA-RIVERA after a successful drug transaction with the UC to Target Location 1 located around the corner from One Orient Avenue, Everett.  As such, agents working on April 20, 2021 set up surveillance at both One Orient Avenue and at Target Location 1.

29.     At approximately 11:09 a.m., after confirming the time of the pending deal,  the UC texted MARTINEZ LARA a description of the UC vehicle.  At approximately 11:34 a.m., I observed an unknown male, later identified as SANTIAGO-TORRES, exit Target Location 1 and begin looking around.  An unidentified male ("UM3") walked up Bow Street, then turned around and headed back in the direction of Target Location 1.  As SANTIAGO-TORRES headed back up Bow Street, however, he turned onto Orient Avenue, and walked toward the UC vehicle.

30.     While SANTIAGO-TORRES approached, the UC received an incoming call from

the Target Telephone 1.   During the call  MARTINEZ LARA confirmed the UC's location and

gave a description of SANTIAGO-TORRES.   MARTINEZ LARA asked how many people

were in the UC vehicle.  The UC confirmed two, the UC and a driver (another undercover

agent).  The UC asked MARTINEZ LARA whether the guy delivering had a beard.

MARTINEZ LARA could be heard speaking in Spanish to another party, then told the UC, "He

got black jacket."   The UC then stated, "Yes tell him to hop in the back seat."

     31.    After SANTIAGO-TORRES entered the UC vehicle, he engaged in a brief

conversation with the UC, but exited the UC vehicle without making an exchange.  After

leaving the UC vehicle, SANTIAGO-TORRES walked back to Target Location 1.

     32.    At approximately 11:39 a.m., the UC received an incoming text message from

Target Telephone 1, which asked, "[H]ey friend what happened?"  The UC responded, "He left.

Still waiting."  Moments later, the UC received a text from Target Telephone 1 that stated, "He

was scared because you were asking him many questions."

     33.    After receiving the text, the UC placed a recorded call to Target Telephone 1.

During the call, the UC explained that he/she did not know if SANTIAGO-TORRES had the

product or if SANTIAGO-TORRES was the right guy.  The UC stated that he/she had wanted

to make SANTIAGO-TORRES feel comfortable.

     34.    At approximately 11:45 a.m., SANTIAGO-TORRES exited Target Location 1

and walked to the UC vehicle.  At approximately 11:46 a.m., the UC received an incoming call

from Target Telephone 1.  During the call, MARTINEZ LARA stated, "Here he comes,"

referring to SANTIAGO-TORRES.  MARTINEZ LARA then instructed the UC to "open the

window and give him the money."  While the UC was still on the line with Target Telephone 1,

SANTIAGO-TORRES entered the backseat of the undercover vehicle, and the UC handed

SANTIAGO-TORRES $5,000.  SANTIAGO-TORRES then handed the UC a white plastic bag

containing a round shaped package wrapped in green cellophane.  The UC confirmed to

MARTINEZ LARA that the transaction was successful.  MARTINEZ LARA thanked the UC.

Agents continued surveillance of SANTIAGO-TORRES until he returned to Target Location 1.

35.     The white plastic bag containing a round shaped package wrapped in green

cellophane contained approximately 285 grams of a substance that field tested positive for the

presence of fentanyl.

<u>Ongoing Deliveries of Fentanyl</u>

36.     **May 7, 2021 Controlled Buy**:  Throughout the investigation the UC has posed as

a drug purchaser who temporarily works out of state.  On April 30, 2021, at approximately 3:31

p.m., the UC placed a call to MARTINEZ LARA and advised that he (the UC) would be in

Massachusetts on Tuesday, May 4, 2021 at approximately 2:00 p.m.  On May 4, 2021, via text

and calls, the UC made several attempts to speak with MARTINEZ LARA.  At approximately

12:15 p.m., MARTINEZ LARA responded, however, the parties were not able to arrange a deal.

In a text message received by the UC at approximately 12:18 p.m., MARTINEZ LARA stated,

"Tomorrow is more better."  On May 5, 2021, after exchanging a series of texts and a call,  a deal

was not completed as planned.

37.     On May 7, 2021, at approximately 9:06 a.m., the UC received an incoming text

message from the Target Telephone which stated in garbled English, "[H]e sends you and the

address will be in Lawrence my friend cannot go a friend will go is a woman."  The UC

responded with a text stating, "Ok. As long as she is cool. 29?"  By "29," the UC was referring

to the amount of fentanyl he wanted to purchase (28.5 fingers or 285 grams). MARTINEZ

LARA replied, "Yes," followed by, "Let me know When you there in Lawrence." At

approximately 10:33 a.m., the UC received an incoming text message from the Target

Telephone with the address, "2 Fordham Lawrence ma."

38.     At approximately 10:50 a.m., agents established surveillance in the area of 2

Fordham Road, Lawrence, Massachusetts. A female, later identified as Genesis Marie

CONCEPCION (CONCEPCION), was observed sitting alone inside a Grey Jeep. The Jeep was

parked in a lot associated with the apartment complex located at 478 Riverside Drive,

Lawrence. At approximately 11:00 a.m. the UC and another undercover officer posing as a

driver arrived in the UC vehicle and parked in the vicinity of 2 Fordham Road. At

approximately 11:04 a.m. the UC sent a text to the Target Phone indicating that he was at the

arranged spot. MARTINEZ LARA responded, "[M]ove a little higher in this direction 47 dewey

st Larences ma." In response, the UC vehicle drove up the street and parked in the vicinity of 47

Dewey Street. At or about the same time, a surveillance agent observed the Jeep, driven by

CONCEPCION, leave the lot where it had been parked, and drive through the surrounding

neighborhood.

39.     At approximately 11:11 a.m., the UC texted Target Telephone 1 that he had

arrived near 47 Dewey Street. In response, MARTINEZ LARA texted, "[G]o to my friend's car"

with an emoji of two hands praying. In response, the UC exited the UC vehicle. The Jeep

driven by CONCEPCION drove toward and stopped next to the UC vehicle. After the

UC entered the Jeep, CONCEPCION handed the UC a black plastic bag containing a round

object wrapped in green cellophane. The UC then handed CONCEPCION $5,000 and left the

Jeep.

40.     A field test conducted on the substance found inside the green cellophane wrapper concluded that the substance was presumptive for fentanyl.  The substance weighed approximately 285 grams.

41.     **May 19, 2021 Controlled Buy**:  Between May 13, 2021 and May 19, 2021, the UC communicated with MARTINEZ LARA, who was using Target Telephone 1, via several consensually recorded calls and text messages.  The purpose of the calls and texts was to purchase 28.5 fingers (285 grams) of fentanyl for $5,000.

42.     On May 19, 2021, at approximately 10:58 a.m., the UC called Target Telephone 1.  When MARTINEZ LARA did not answer, the UC left a message informing MARTINEZ LARA that he would be ready by 3:00 p.m.  At approximately 1:19 p.m., the UC called Target Telephone 1.  After discussing the agreed date for the deal,  MARTINEZ LARA stated, "Let me call him because he's in work right now."  By "him" the UC understood that MARTINEZ LARA was referring to an associate who would participate in completing the deal.

43.     At approximately 1:46 p.m., the UC sent an outgoing text to MARTINEZ LARA stating, "Let me know. I need to get a ride."  Approximately nine minutes later, the UC received a text message from  MARTINEZ LARA, which simply stated, "Hey."  In response, the UC placed an outgoing call to Target Telephone 1.  After answering, MARTINEZ LARA told the UC to drive to Boston.   MARTINEZ LARA stated that he would text the UC an address.  Thereafter, at approximately 2:23 p.m., the UC received an incoming text message from Target Telephone 1, which stated, "132 highland st Roxbury ma."

44.     In anticipation of the planned deal, agents established surveillance in the

neighborhood of 132 Highland Street in Roxbury, Massachusetts.  At approximately 4:16 p.m.,
the UC placed a call to Target Telephone 1.  During the call, the UC informed MARTINEZ
LARA that he (the UC) was parked down the street from 132 Highland Street.  In response,
MARTINEZ LARA stated that he would call his "guy" to meet the UC.

45.    At approximately 4:19 p.m., the UC received a text from Target Telephone 1 that
stated, "He is already on his way to where you [are]."   At around this time, agents conducting
surveillance in the area of 132 Highland Street observed a gray Acura MDX SUV (the "Acura")
driving through the Highland Street neighborhood. At approximately 4:46 p.m., the UC
received an incoming call from Target Telephone 1.  During the call the UC described his
location for MARTINEZ LARA.  After the call, the UC received a text message from Target
Telephone 1, which stated, "75 Thornton st."  The text was followed by a call from Target
Telephone 1.  During the call the UC told  MARTINEZ LARA that he (the UC) did not want to
do the deal at the location provided by MARTINEZ LARA.  Following the call,  the UC
received a text message from Target Telephone 1 that stated, "There is no one in that area no
one is going to see everything is fine friend see he is waiting there because he does not know
where you are."  The UC responded via text, telling MARTINEZ LARA, "My driver wants to
leave.  If he drives down cedar st I will stand there in green shirt."

46.    At approximately 5:05 p.m., the UC received an incoming text message from
Target Telephone 1.  The text included  a photograph of a street sign for Cedar Street in
Roxbury.  The text instructed, "He is in [sic] 5 cedar st."  In response, the UC texted that he was
parked at the other end of Cedar Street.

47.    Minutes later, at approximately 5:12 p.m., the Acura arrived in the parking lot

where the UC vehicle was parked.   Via text from Target Telephone 1, the UC was instructed to follow the Acura.  The UC vehicle then followed the Acura from Cedar Street to Centre Street, where the Acura pulled over.  The UC then parked, got out of the UC vehicle, and approached the Acura on foot.  As the UC entered the front passenger side of the Acura, the operator and sole occupant, later identified as Luis Manuel LARA ALCANTARA (LARA ALCANTARA), picked up a baseball-sized object wrapped in green cellophane from the front passenger seat.

48.    Once the UC was  inside the Acura, LARA ALCANTARA put his hand out to the UC and asked for the money. The UC then handed LARA ALCANTARA $5,000. In exchange, LARA ALCANTARA handed the UC the baseball-sized object wrapped in green cellophane. Throughout the transaction MARTINEZ LARA, who could be heard over a speaker phone, translated for LARA ALCANTARA.

49.    At approximately 5:19 p.m., the UC exited the Acura and returned to the UC vehicle.  At 5:20 p.m., the UC sent a text message to MARTINEZ LARA with a thumb's up emoji, indicating that the deal was successful.  Thereafter, the baseball-sized object wrapped in green cellophane obtained from LARA ALCANTARA field tested positive for the presence of fentanyl.

50.    **June 14, 2021 Controlled Buy**:  On June 14, 2021 at approximately 9:52 a.m., the UC placed an outgoing call to Target Telephone 1 that was answered by MARTINEZ LARA. The UC and MARTINEZ LARA discussed a fentanyl transaction for later that day at 2:00 p.m.  During the call MARTINEZ LARA stated he would call the UC back and give him a meeting location for the sale.

51.    At approximately 10:20 a.m., the UC placed an outgoing call to Target Telephone

1 and left MARTINEZ LARA a voicemail for MARTINEZ LARA that stated that he (the UC) was with his boss and therefore might not answer his phone.  The UC  asked MARTINEZ LARA  to communicate via text.  After leaving the voicemail, the UC conveyed the same message via text to Target Telephone 1.

52.     At approximately 10:29 a.m., UC received a text from Target Telephone 1 text that stated, "I'm talking to my other person, that's why I didn't answer you."  At approximately 11:42 a.m., Target Telephone 1 sent the UC a text message stating, "1 orient ave everett ma 02149."  Agents recognized the address as that used by UM3 during the controlled buy on April 20, 2021 described above.  In addition, the meeting location at 1 Orient Avenue, Everett, is within walking distance of Target Location 1.

53.     At approximately 2:10 p.m., surveillance was established in the area of 1 Orient Avenue and Target Location 1.   At approximately 2:19 p.m., the UC, driven by another undercover agent, parked in the vicinity of 1 Orient Avenue, Everett.  The UC then sent a text message to Target Telephone 1 that described the UC vehicle and informed MARTINEZ LARA that he (the UC) had arrived at the meeting location.

54.     At approximately 2:26 p.m., MARTINEZ LARA responded, "Ok" and "He Coming now." At approximately 2:46 p.m., MARTINEZ LARA sent a text message to the UC stating, "He is there in 11 min."  At approximately 3:10 p.m., surveillance observed black a Honda Accord arrive on Orient Avenue and park near the UC vehicle. The black Honda was driven by LARA ALCANTARA.  The front passenger seat was occupied by a female, who at the time was unidentified ("UF2").

55.     After arriving at 1 Orient Avenue, LARA ALCANTARA motioned for the UC to

17

approach.  In response, the UC exited the UC vehicle and got into the back seat of the black

Honda Accord.   LARA ALCANTARA then removed a green, plastic-wrapped baseball size

package from between his legs and put it on the floor beside the UC's leg. In exchange, the UC

handed LARA ALCANTARA $5000.00.  The UC then exited the black Honda and returned to

the UC vehicle.  At 3:14 p.m., the UC sent a text message to Target Telephone 1 with a thumbs

up emoji and "thank you," indicating the deal was complete.  Thereafter, a  field test conducted

on the green, plastic-wrapped baseball size package obtained from LARA ALCANTARA was

positive for the presence of fentanyl.

<u>MARTINEZ LARA travels to Massachusetts and Target Location 1</u>

56.     Over the course of the investigation MARTINEZ LARA has traveled to

Massachusetts on multiple occasions.  On each trip, MARTINEZ LARA traveled from his

home in New York to Massachusetts.  After arriving in Massachusetts, MARTINEZ LARA

traveled to Maine, then back to Massachusetts, before returning to New York.  Each trip from

New York to Massachusetts and then Maine ended with MARTINEZ LARA returning to New

York within approximately 24-38 hours.   Based upon my training and experience, I believe that

MARTINEZ LARA traveled to Massachusetts on July 29, 2021 and joined SANTIAGO-

TORRES in front o Target Location 1 in furtherance of the Target Offense.

57.     **April 12, 2021-April 14, 2021**:  On April 12, 2021 I conducted court-ordered

surveillance of Target Telephone 1 as it traveled from the Bronx, New York to Massachusetts.

Target Telephone 1 left New York City at approximately 2:08 p.m., traveled through

Connecticut, and arrived in the vicinity of at approximately 6:22 p.m.  . At approximately 9:52

p.m., I observed that Target Telephone 1 was in the area of Andover Street and Industrial Way

in Lawrence. Surveillance was terminated at this time.

58.    On April 13, 2021, at approximately 3:37 p.m., I observed that Target Telephone 1 was located in the area of I-95 and Etna Road, outside Bangor, Maine.  At approximately 11:23 p.m., Target Telephone 1 had returned to the vicinity of Lawrence, Massachusetts.  On April 14, 2021, at approximately 12:07 a.m., Target Telephone 1 was located in the vicinity of I-495 and I-93 in Massachusetts. Target Telephone 1 remained in this area until approximately 4:23 a.m., when it traveled to Lawrence.   A short time later, at approximately 5:08 a.m., Target Telephone 1 was located at the I-93 and I-90 interchange in Boston. At approximately 5:22 a.m., Target Telephone I was located on I-90 in the Newton, MA area in the vicinity of St. James Street. At approximately 5:38 a.m., Target Telephone 1 was located on I-90 in the Newton, in the vicinity of Lowell Avenue. At approximately 6:09 a.m., Target Telephone 1 was located on I-90 in the Auburn, Massachusetts area in the vicinity of the I-290 interchange. At approximately 10:08 a.m., Target Telephone 1had returned to the Bronx, New York.

59.    **May 11, 2021-May 2021**:  On May 11, 2021, agents participating in the ongoing investigation of MARTINEZ LARA and his associates learned from information gained as a result of a court-authorized surveillance, that Target Telephone 1 had departed the Bronx, New York and was headed toward Massachusetts.  At approximately 2:00 p.m., Target Telephone 1 was located in the vicinity of an apartment building at 478 Riverside Drive, Lawrence.

60.    At approximately 4:34 p.m., an agent conducting surveillance observed a dark skinned male, later identified as LARA, exit the rear apartment door of 478 Riverside Drive. LARA was observed entering the rear passenger door of a black Honda Accord.

61.    At approximately 5:12 p.m., an agent conducting surveillance observed a Grey

Jeep Cherokee arrive in the parking lot at 478 Riverside Drive.  As the Jeep  arrived, the driver of the black Honda Accord flashed his headlights.  In response, the Jeep backed in next to the black Honda Accord.

62.    At approximately 5:25 p.m. a surveillance agent observed the Jeep depart the parking lot at 476 Riverside Drive.  At approximately 5:38 p.m. the Jeep arrived and parked at the "Pollo Tipico" restaurant located at 190 Lawrence Street, Lawrence.  MARTINEZ LARA exited the front passenger's side of the Jeep and entered the restaurant.  Approximately ten minutes later, MARTINEZ LARA left the restaurant and entered the front passenger side of the Jeep.  The Jeep, driven by CONCEPCION, departed the area and traveled north on I-495.

63.    At approximately 6:11 p.m. a marked Massachusetts State Police unit observed the Jeep speeding.  The Jeep was pulled over just prior to the Massachusetts-New Hampshire state line.  Thereafter the driver of the Jeep was identified as CONCEPCION.  The passenger in the Jeep was identified as MARTINEZ LARA.  The  Jeep was released at approximately 6:16 p.m.

64.    Thereafter, agents followed the Jeep  north on I-95 into New Hampshire. Visual surveillance was then terminated.  Data obtained pursuant to a court order described above indicated that Target Telephone 1 phone was located in Lincoln, Maine at approximately 11:29 p.m.

65.    At approximately 11:26 a.m. on May 12, 2021, an agent conducting surveillance observed a black livery van arrive at Target Location 1.  At approximately 11:31 a.m., an agent observed MARTINEZ LARA exit Target Location 1 and get into the waiting livery. The shuttle then departed.  At approximately at 3:59 p.m. on May 12, 2021, location data indicated that Target Telephone 1 had returned to the Bronx, New York.

66. **June 15, 2021-June 16, 2021**: On June 15, 2021, I was performing court authorized surveillance of Target Telephone 1 as it traveled from New York to Massachusetts. At approximately 12:45 p.m., agents established surveillance in the vicinity of Target Location 1. At approximately 1:19 p.m., I observed a black livery van arrive in front of Target Location 1. At that time, I observed MARTINEZ LARA exit the van holding a black backpack and enter the residence at Target Location 1.

67. At approximately 2:40 p.m., I observed MARTINEZ LARA talking to the unidentified male driver of a grey Acura ("UM4") as it was parked on Orient Avenue next to the residence at Target Location 1. Both the driver of the Acura and MARTINEZ LARA entered Target Location 1 shortly thereafter.

68. At approximately 3:28 p.m., I observed that data from the court authorized GPS tracker indicated that the Jeep was traveling on Broadway in Everett. At approximately 4:05 p.m., an agent observed the Grey Jeep parked in front of Target Location 1. After the driver of the Jeep sounded the horn, an agent observed the door to Target Location 1 open for a brief moment. The Jeep then backed up and parked on Orient Avenue. Thereafter, CONCEPCION left the Jeep and entered the residence Target Location 1.

69. At approximately 4:11 p.m., I observed via covert surveillance camera, UM4 exit the residence located at Target Location 1 holding a white shopping bag and walk around the corner toward the Acura parked on Orient Avenue. I then observed the Acura depart the area and turn left on to Broadway toward Boston. An agent conducting surveillance observed the Acura near the Encore Casino, turn left onto Bow Street and head back toward the direction of Target Location 1. At approximately 4:40 p.m., an agent observed the Acura parked across and

down the street from the residence at Target Location 1.

70.     At approximately 4:45 p.m., an agent observed CONCEPCION exit the residence at Target Location 1 and move the Jeep from Orient Avenue to Bow Street. The agent observed CONCEPCION exit the driver's seat, open the rear driver's door, and reach into the Jeep, toward the floorboard behind the driver's seat. The agent observed CONCEPCION bent over in a manner consistent with reaching under the back seat for approximately five minutes before returning to the residence at Target Location 1.

71.     At approximately 5:03 p.m., I observed, via a covert surveillance camera, UM4 enter Target Location 1.  At the time, UM4 was not carrying anything.  Approximately one minute later UM4 exited Target Location 1, walked back to the Acura, and departed the area.

72.     At approximately 5:08 p.m., I observed, via a covert surveillance camera, CONCEPCION and MARTINEZ LARA exit the residence at Target Location 1 and walk in the direction of the parked Jeep.  Thereafter,  GPS location data indicated that the Jeep traveled through Everett, to New Hampshire, and then to Maine.

73.     On June 16, 2021, at approximately 1:46 a.m., I  observed that the Jeep had returned to Massachusetts and parked in the vicinity of Target Location 1. At approximately 5:04 a.m., location data indicated that Target Telephone 1 was traveling on Interstate 90 in Newton, near Lowell Avenue. At approximately 5:27 a.m., GPS data indicated that the Jeep had traveled to Ferry Street, in Lawrence, Massachusetts where it remained.

74.     At approximately 9:18 a.m., location data indicated that Target Telephone 1 had returned to New York and was stationary in the vicinity of an apartment building located at 471 Swinton Avenue, Bronx, New York.

<u>July 29, 2021 Detention of MARTINEZ LARA and SANTIAGO-TORRES</u>

75.     On July 29, 2021, agents participating in the ongoing investigation of

MARTINEZ LARA and his associates learned from information gained as a result of a court-

authorized surveillance, that Target Telephone 1 had departed the Bronx, New York and was

headed toward Massachusetts.

76.     At approximately 9:11 a.m., surveillance was established in the vicinity of Target

Location 1.  At approximately 9:13 a.m. an agent observed  a black livery van arrive in front of

Target Location 1.  At that time, SANTIAGO-TORRES exited the livery, carrying a dark

colored backpack.  After exiting the livery, SANTIAGO-TORRES left the area on foot.  He

returned at approximately 9:38 a.m. At this time SANTIAGO-TORRES was still in possession

of the backpack and carrying a coffee.

77.     SANTIAGO-TORRES was  then observed  pacing back and forth near the front

door of Target Location 1 while talking on a cellular telephone.  At approximately 9:41 a.m.

SANTIAGO-TORRES walked up the driveway of Target Location 1, then attempted to conceal

the backpack by hanging it on a fence, adjacent to a bush.  At approximately 9:59 a.m.,

SANTIAGO-TORRES retrieved the backpack and returned to the front of Target Location 1.

As SANTIAGO-TORRES approached the front of Target Location 1, a white Hyundai Santa Fe

parked across the street from Target Location 1.  At this time, agents observed MARTINEZ

LARA exit the front passenger door of the Hyundai.  MARTINEZ LARA crossed the street and

joined SANTIAGO-TORRES near the front door of Target Location 1.  At this time, agents

approached both men.

78.     Based upon their training and experience and knowledge of the ongoing

investigation, as well as the suspicious nature in which the backpack had been handled, agents detained and arrested both men.

THE TARGET LOCATION

79.     I know from my training and experience that it is common for drug distributors to use their residences, as well as locations separate from their residence and/or from their main store of illicit drugs, called a "stash houses," to store smaller quantities of drugs for their runners to access.  I know that the use of multiple locations has certain advantages for drug distributors including, (a) to further protect the identity of the drug distributor during drug transactions, and (b) to protect a larger store of drugs.

80.     Target Location 1 (181A Bow Street, Everett, Massachusetts) is a single story, cement block building attached to a  building multi-story dwelling with white-colored siding.  A description and photographs of Target Location 1 appear in Attachment A.

81.     Based on the investigation, I believe that Target Location 1 is the residence and/or stash house of MARTINEZ LARA.   In particular, surveillance of Target Location 1 demonstrated that SANTIAGO-TORRES traveled from Target Location 1 before the controlled buy on April 20, 2021 and returned to Target Location 1 immediately after the controlled buy described above.  It is a location frequented by MARTINEZ on his regular overnight trips to Massachusetts.

**CONCLUSION**

82.     Based upon the evidence set forth above, as well as my training and experience, I submit that there is probable cause to believe that beginning in February 2021 and continuing until at least July 29, 2021, I believe that MARTINEZ LARA, SANTIAGO-TORRES, and

24

others did knowingly and intentionally conspire to commit the Target Offense.  Accordingly, I

respectfully request that a criminal complaint charging MARTINEZ LARA with violating 21

U.S.C. § 846 be issued.

83.     Further, I believe that like many drug traffickers, MARTINEZ LARA uses Target

Location 1 in furtherance of his ongoing drug-trafficking activities, and that, among other

things, documentary, and other evidence regarding those activities, including, but not limited to

the items set forth in Attachment B will be found in Target Location 1.  See e.g., United States

v. Feliz, 182 F.3d 82, 87-88 (1st Cir. 1999).[2]  Accordingly, I respectfully request that  a search

warrants be issued for Target Location 1 for those items set forth in Attachment B .

---

[2]  In Feliz, the First Circuit made clear that, in the drug trafficking context, evidence of drug
transactions can be expected to be found in a drug trafficker's residence for months after evidence
of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in
trafficking cases involving [three months long] or even longer periods") (citing United States v.
Greany, 929 F.2d 523, 525 (9th Cir. 1991)(two year-old information relating to marijuana
operation not stale)).  As the First Circuit has explained "[b]y its very nature, drug trafficking, if
unchecked, is apt to persist over relatively long periods of time."  *United States v. Nocella*, 849
F.2d 33, 40 (1st Cir. 1988).

84.    Based on the foregoing, I request that the Court issue the proposed warrants,

pursuant to Federal Rule of Criminal Procedure 41.

85.    I declare that the foregoing is true and correct.

_Robert Frasca_ _____

ROBERT FRASCA, SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn to by telephone in accordance with Fed. R. Crim. P. 4.1 this 29th day of July 2021.

4:15 p.m.

HONORABLE DAVID HENNESSY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

26

## ATTACHMENT A

**Target Location 1** (Description of premises to be searched)

181A Bow Street, Everett, Massachusetts is a single story, cement block building attached to multi-story dwelling with white-colored siding. Photographs of the building and front door to are attached.

 

27

**ATTACHMENT B**
(Items to Be Seized)

1) Documents, dated or created from January 1, 2020 to present, of purchases, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances used to manufacture controlled substances, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

2) Documents, dated or created from January 1, 2020 to present, and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including containing data reflecting or memorializing the manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including records of sales, records keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, recordings, telephones, vehicle records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, and personal identification documents.

3) Photographs and video and audio recordings which document an association with other coconspirators and/or which display controlled substances, firearms, or chemicals/materials used in the manufacturing of controlled substances.

4) Materials, equipment and paraphernalia associated with the manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including, but not limited to, packaging materials, storage bins, containers, cutting agents, and scales.

5) Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items.

6) Cell Phones identified as used by or belonging to s: From January 1, 2020 to present, all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing narcotics trafficking and/or referencing individuals engaged in narcotics trafficking, located in the memory of any mobile telephone belonging to or identified as being used by Cristopher Samuel Martinez Lara and/or Javier Santiago-Torres, and described as the mobile telephone's:

   a)   Incoming call history;

28

b)      Outgoing call history;

c)      Missed call history;

d)      Outgoing text messages;

e)      Incoming text messages;

f)      Draft text messages;

g)      Telephone book;

h)      Data screen or file identifying the telephone number associated with the mobile telephone  searched;

i)      Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;

j)      Voicemail;

k)      User-entered messages (such as to-do lists);

l)      Browser messages and/or internet communications (*e.g.*, e-mail; text messages) both to and from the cellular telephone (including any in draft form) relating to or referencing narcotics trafficking or money laundering or individuals engaged in narcotics trafficking or money laundering;

m)      Photographs; and

n)      Any passwords used to access the electronic data described above.

29